IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH R. FALCON, M.D.,            )

                    )

        Plaintiff,      )

                    )

vs                  )      Civil Action No. 19-404

                    )

                    )      Magistrate Judge Dodge

THE NORTHWESTERN MUTUAL LIFE  )

INSURANCE COMPANY,        )

                    )

        Defendant.    )

## MEMORANDUM OPINION

Plaintiff Joseph R. Falcon, M.D. ("Dr. Falcon") brings this action against defendant The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), in which he seeks benefits to which he believes he is entitled under a disability income policy. Northwestern Mutual paid Dr. Falcon disability benefits for 24 months but asserts that the policy it issued did not provide him with a lifetime benefit as he contends because he did not become totally disabled prior to the policy anniversary date following his 60th birthday.

Presently pending before the Court is Northwestern Mutual's motion for summary judgment. For the reasons that follow, its motion will be denied.

### I.   **Relevant Procedural History**

Dr. Falcon commenced this action in March 2019 in the Court of Common Pleas of Allegheny County, Pennsylvania. Northwestern Mutual removed the action to this Court on the basis of diversity jurisdiction. Dr. Falcon later filed a Second Amended Complaint (ECF No. 27) which includes seven causes of action, including breach of contract, negligence, fraud, negligent misrepresentation, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 to 201-9.3 ("UTPCPL"), bad faith in violation of 42 Pa. C.S.

§ 8371 and a claim for declaratory relief. The parties have consented to full jurisdiction before a United States Magistrate Judge.

On May 29, 2020, the parties stipulated to the dismissal of the fraud claim in Count III (ECF No. 31). On the same date, Northwestern Mutual moved for summary judgment with respect to the remaining claims. Its motion has been fully briefed (ECF Nos. 33, 38, 41).

**II.    Relevant Factual Background**

    **A.  The Application and Policy Issuance**

In February 1990, Dr. Falcon purchased two disability policies from Northwestern Mutual: Disability Income Policy No. D731755 (hereinafter, "the Policy"); and a disability overhead expense policy. (Defendant's Concise Statement of Material Facts ("DCSMF") ¶ 1.)[1] Only the Disability Income Policy is at issue in this case.

According to Dr. Falcon, his attorney advised him that he needed to protect his family if something should happen to him by obtaining a disability policy which would cover him for a lifetime. (Falcon Dep. 13:13-14;[2] DCSMF ¶¶ 2-3) Dr. Falcon wanted a policy that would cover him if he was unable to perform all of his activities as a practicing plastic surgeon and that would provide for lifetime benefits if he became disabled. (*Id.* at 14:19-24.)

In response to his inquiry, a Northwestern Mutual representative recommended a Northwestern Mutual policy that would provide him with disability benefits. (*Id.* at 14:25-15:4.) See Plaintiff's Response to Defendant's Statement of Material Facts ("PRDSMF") ¶ 53.)[3] Dr. Falcon applied for a disability income policy and disability overhead expense policy with the

---

[1] ECF No. 34.
[2] ECF No. 39 Ex. 1.
[3] ECF No. 39.

assistance of Gary Helman, a financial representative for Northwestern Mutual. Dr. Falcon met with Mr. Helman on February 6, 1990, to sign an application for the policies.  According to Dr. Falcon, the handwriting on the disability insurance application is not his. (DCSMF ¶¶ 4-6.) Dr. Falcon was unsure if Mr. Helman filled out the application but asserts that he would not have signed it without receiving an explanation about the policy from Mr. Helman and signed it at the same time that it was completed. (PRDSMF ¶ 7.)

The following boxes are checked on the application: Monthly Benefit of "$15,000"; Maximum Benefit Period "LF" (meaning "life"); Beginning Date "91"; and "Initial Period to Age 65" (as opposed to "Initial Period to Age 70"). (ECF No. 39-1, Ex. 4 at 2.)

Regarding the application process to obtain a disability insurance policy from Northwestern Mutual, its corporate designee, Donald Seebach, testified that:

> As far as an underwriter goes, we realize that there is an agent in the field that would take the application from the proposed insured like Dr. Falcon, and that gets partially input in the field office, gets sent to the home office to complete application input, and then gets assigned to an underwriter. The underwriter looks at the information on there, decides if they need additional information, and if they are able to issue a policy, then they issue the policy. And sometimes we have to change the terms of what was applied for.

(DCSMF ¶ 8.)

Dr. Falcon represents that Mr. Helman provided him with a quote for a policy with a premium of $6,705.00 per year that would provide a lifetime benefit of $15,000 per month upon the occurrence of a disability prior to the policy anniversary that followed his 65th birthday. (PRDSMF ¶ 55.)[4] Dr. Falcon decided to purchase the Policy. (*Id.* ¶ 56.)

---

[4] Northwestern Mutual denies that it made any such statement because it does not offer such a policy. This issue is discussed below.

Dr. Falcon believed that he was purchasing a policy with a lifetime benefit for a disability arising during the Policy's initial period to age 65. (Falcon Dep. 16:20-21, 30:20-25.) The application itself did not include definitions or other details regarding any provision of the Policy that may be relevant to Dr. Falcon's understanding and Northwestern Mutual does not contend that Mr. Helman explained the limitations of the Policy to Dr. Falcon at any time.

Upon issuance of a policy, it is Northwestern Mutual's practice to mail the policy to the financial representative who, in turn, delivers the policy to the policyholder. Its internal documents reflect that the Policy was mailed to Dr. Falcon's financial representative on March 20, 1990. Dr. Falcon does not remember receiving a copy of the Policy in 1990 or seeing it until after he became disabled before December 2016, when he asked for a copy. (DCSMF ¶¶ 9-13.)[5] Dr. Falcon has maintained a file of all his insurance policies issued over the past 30 years, but it does not include copies of the Policy or the overhead office insurance policy he also obtained at the same time. (PRDSMF ¶ 62.) Northwestern Mutual did not produce any documentation that shows that Dr. Falcon was provided with the Policy. (*Id.* ¶ 64.)

Over the years, Dr. Falcon occasionally met with Northwestern Mutual agents, including after he turned age 60, and was never told "that the policy you are under is only a two-year policy." (*Id.* ¶ 65.) Indeed, after Dr. Falcon turned 60, he met with several agents to discuss extending his Policy after age 65. They informed him that if he were to do so, it would only cover two years of benefits in the event he became disabled, his premiums would increase to

---

[5] Plaintiff's statement asserts that Dr. Falcon "did not receive a copy of the Policy" (PRDSMF ¶ 61), but it refers to Dr. Falcon's testimony that he did not receive a copy of the application at the time he signed it, not the Policy itself (Falcon Dep. 20:24-21:2.)

over $8,000, and there was no option for a lifetime benefit. Dr. Falcon declined to extend coverage. (*Id.* ¶ 66.)

Dr. Falcon did receive annual premium statements and declarations over the years. These identified a lifetime benefit with an initial benefit to age 65. Internal documents maintained by Northwestern Mutual also show Dr. Falcon's benefits period "to age 65 W/LTB" and an initial period to 65. (*Id.* ¶¶ 68-69.)

### B.  Dr. Falcon Becomes Disabled

On December 18, 2016, at age 64, Dr. Falcon became disabled from his occupation as a plastic surgeon due to vision loss. He immediately notified his insurance agent of a claim under the disability income policy issued by Northwestern Mutual. In January 2017, he formally requested disability benefits under the policy, claiming to have become disabled from his occupation as a plastic, reconstructive and hand surgeon due to optical neuropathy causing partial vision loss in his left eye. (DCSMF ¶¶ 14-15; PRDSMF ¶¶ 72-73.)

Dr. Falcon spoke with Andrew Falk, an analyst and technical advisor for Northwestern Mutual. According to Dr. Falcon, Mr. Falk sarcastically remarked during their conversation that it was "convenient" that Dr. Falcon became disabled just months before his Policy would expire. (PRDSMF ¶ 75.) Mr. Falk denies making this statement. (Defendant's Response to Plaintiff's Counterstatement of Material Facts ("DRPCMF") ¶ 75.)[6]

Upon receipt of the claim, Northwestern Mutual began gathering medical and financial information, including interviewing Dr. Falcon on January 23, 2017. The Interview Guide completed by Mr. Falk states that he reviewed with Dr. Falcon the maximum benefit period of 24

---

[6] ECF No. 40.

months that Northwestern Mutual asserts is applicable under the policy. As set forth in correspondence dated April 6, 2017, Northwestern Mutual determined that Dr. Falcon was totally disabled as of December 18, 2016 and approved his disability claim. In its letter, it further advised that the Beginning Date for benefits would be March 18, 2017 and reviewed the applicable Maximum Benefit Period. (DCSMF ¶¶ 16-18.) Northwestern Mutual advised Dr. Falcon that he was only entitled to a maximum benefit period of 24 months rather than a lifetime benefit because he had not become disabled prior to the anniversary date following his 60th birthday, namely by February 6, 2012. (ECF No. 39-1 Ex. 7.)

Upon learning that Dr. Falcon did not have an original copy of the Policy, Northwestern Mutual assembled a "substitute" policy for him. The substitute policy identifies an annual premium of $8,370 for a maximum benefit period of 24 months. It does not provide for a lifetime benefit. The substitute policy further provides that it is guaranteed renewable after the insured's 65th birthday, and that its terms and premiums cannot be changed. It states: "THIS SUBSTITUTE POLICY IS ISSUED ON THE REPRESENTATION THAT THE ORIGINAL POLICY HAS BEEN LOST OR DESTROYED IT MAY NOT BE AN EXACT DUPLICATION OF THE ORIGINAL POLICY." (PRDSMF ¶¶ 76-81.)

The page numbers are inconsistent in the substitute policy and page 4 is missing. (*Id.* ¶ 82.) Northwestern Mutual asserts that older policies like this one did not have a page 4 and began on page 5. (DRPCMF ¶ 82.)

### C.  The Replica Policy and Relevant Practices of Northwestern Mutual

On August 29, 2018, nearly two years after Dr. Falcon's initial claim, Northwestern Mutual sent Dr. Falcon a "replica policy," which it contended represented his policy (the "Replica Policy"). Notably, it was different than the substitute policy that it had previously

provided. The Replica Policy has a premium of $6,705.00.[7] It limits benefits to 24 months for any disability occurring after the policy anniversary following the insured's 60th birthday. (PRDSMF ¶¶ 84-85.)

Northwestern Mutual issued monthly disability payments of $15,000 to Dr. Falcon for 24 months, $15,000 per month being the full benefit available under the Policy. Northwestern Mutual relied on the following Policy provision in issuing payments for 24 months:

MAXIMUM BENEFIT PERIOD

TO FEBRUARY 6, 2017, BUT NOT LESS THAN 24 MONTHS OF BENEFITS, WITH LIFETIME FOR TOTAL DISABILITY AS PROVIDED IN SECTION 1.7.

(DCSMF ¶¶ 19-20.)

Northwestern Mutual asserts that this Maximum Benefit Period provision pays disability benefits until the policy anniversary following age 65—here, February 6, 2017—or for 24 months, whichever is greater. Since Dr. Falcon became disabled on December 18, 2016, he was entitled under this provision to 24 months of benefits rather than benefits until February 6, 2017. Thus, although the Policy was in place for a disability arising until he reached age 65, the period of benefits only extended for a "lifetime" if the disability arose prior to the policy anniversary date following his 60th birthday—after that, the period of benefits was limited to 24 months. (DCSMF ¶¶ 19, 24-28.)

In turn, Dr. Falcon contends that the time period during which he receives benefits should be governed by the Lifetime Benefits provision rather than the Maximum Benefit Period provision. (PRDSMF ¶¶ 21-22.) However, Dr. Falcon does not rely on any provision of the

---

[7] The original version sent to Dr. Falcon in 2018 did not include pages 4, 6, 8 and 10. Northwestern Mutual later "recreated" the missing pages.

Replica Policy in connection with the claims in this action.

In his application, Dr. Falcon selected the optional Lifetime Benefit provision. The Replica Policy includes a lifetime benefit for total disability upon the incurrence of a disability before policy anniversary following the insured's 60th birthday:

### 1.7 LIFETIME BENEFIT FOR TOTAL DISABILITY

If page 3 provides that the Maximum Benefit Period has a lifetime benefit for total disability, then the Full Benefit is payable as long as total disability continues during the lifetime of the Insured, provided:

> • The Insured is totally disabled on the policy anniversary that follows his 60th birthday; and

> • The total disability continues beyond the policy anniversary that follows his 65th birthday.

(DCSMF. ¶¶ 23-24.)

Northwestern Mutual's corporate designee, Tricia Hoesly, testified that when Dr. Falcon applied for a disability income policy in 1990, the Company did not offer a policy with a lifetime benefit provision that did not require the disabled policyholder to be disabled by the policy anniversary following age 60. Ms. Hoesly also stated that Northwestern Mutual has never offered a disability income policy with a lifetime benefit for total disability occurring after the policy anniversary following the insured's 60th birthday. (*Id.* ¶¶ 25-26.)[8]  Ms. Hoesly was not employed at Northwestern Mutual at the time he purchased his Policy. (PRDSMF ¶ 25.)[9]

---

[8] Dr. Falcon contends that Ms. Hoesly testified only that she was unaware of such policies, not they did not exist. Although the question was asked as whether she was aware, her answer was: "No. The insured would have to be totally disabled by the policy anniversary following age 60 through the policy anniversary following age 65 in order to receive lifetime benefits." (Hoesly Dep. 19:2-5.) (ECF No. 35 Ex. C.)

[9] In his brief, Dr. Falcon emphasizes that none of Northwestern Mutual's witnesses were actually

The application signed by Dr. Falcon selected "Initial Period to Age 65." The term "Initial Period" is defined in the Replica Policy as:

**Initial Period**. This is a period of time that starts on the Beginning Date and continues, while the Insured is disabled, for the length of time shown on page 3. The definition of total disability changes after the Initial Period.

The definition of "Total Disability" is:

**Total Disability**. Until the end of the Initial Period, the Insured is totally disabled when he is unable to perform the principle duties of his occupation. After the Initial Period, the Insured is totally disabled when he is unable to perform the principal duties of his occupation and is not gainfully employed in any occupation.

(DCDMF ¶¶ 27-29.) Dr. Falcon denies, however, that the Replica Policy is an accurate copy of the Policy he purchased.

Ms. Hoesly testified that the "initial period" is also referred to as an "own occupation period." Northwestern Mutual looks at the initial period to determine if an insured meets the definition of total or partial disability in the policy; it also looks at what the insured's occupation was at the time of the onset of disability. Northwestern Mutual offers different "Initial Periods" (e.g., to age 65, to age 70, five years, or two years) during which a policyholder can claim total disability based on his own occupation—versus being disabled from any occupation. Mr. Seebach testified that "initial period to age 65" meant the policyholder "would be paid to age 65 for their own occupation." (*Id.* ¶¶ 30-32.)

According to Northwestern Mutual, it does not retain physical copies of originally issued policies. The original executed policy goes to the policyholder. Northwestern Mutual states that

---

employed at Northwestern Mutual in 1990. (ECF No. 38 at 5, 10, 14) See Gurlick Dep. 9:1-2 (ECF No. 35 Ex. E); Seebach Dep. 8:6-14 (ECF No. 35 Ex. B); Falk Dep. 9:18-10:2 (ECF No. 35 Ex. F).

it retains copies of the policyholder's application and supporting documents that were originally reviewed by underwriting, as well as electronically stored information about each policy issued, allowing it to produce an accurate reproduction of the as issued policy, if necessary. (*Id.* ¶¶ 33-35.)

Andrew Falk testified that Northwestern Mutual has a computer system that shows the insured's "policy numbers, the specifications of which policy it is, what series it is, what state it was issued in. And, as needed, [the Northwestern Mutual representative] can pull up the exact contract language by referring to those details." (*Id.* ¶ 36.)

Mr. Falk also testified as follows:

Q. What does original policy mean to you?

A. The exact wording that was issued for that contract in that series in that state, and I am able to pull that exact wording.

…

Q. So what would the format have been of what you reviewed on your system relative to policy documents that Northwestern Mutual was asserting Dr. Falcon was entitled to?

A. I would refer to the sample contract of this exact series and product as well as referring to which options he had selected as noted in our systems, and quoting the exact language that would have appeared in the contract.

(*Id.* ¶ 37.)

If a policyholder requests a copy of his policy, Northwestern Mutual will provide either a replica or a substitute copy. A replica policy can be created either "as issued" (i.e., from the record of what Northwestern Mutual originally issued and not including any changes to the policy that may have occurred after the date of issuance) or "as current" (i.e., including any changes between the date of issuance and the date the replica policy is requested). A "substitute

10

policy" is created from the record of what Northwestern Mutual originally issued but includes any changes since then—so it reflects the policy terms as of the date it is created, rather than as of the date the policy was issued originally. Corporate designee Kristine Woyach testified, "[a] substitute policy is how a policy looks today," and a "replica policy is how the policy looked at issue." Ms. Woyach testified that a replica policy is created by first reviewing the record at issue, which is created the day after a policy is approved or issued. (*Id.* ¶¶ 38-42.)

> Ms. Woyach further testified about how the record at issue is created as follows:
>
> So the day after [the policy] is approved by the underwriting department, they take something called "take final action," so they approve it in the system, and the very next day the contract pages are produced, and along with that comes up the record at issue, and the record at issue is attached to the original disability application and maybe the medical history questionnaire, anything else that was sent in, and that is all scanned into a system and kept so anyone could be able to access that. And that's kept on file forever.

(*Id.* ¶ 43.)

Northwestern Mutual states that it inputs the information from the record at issue into a computer program that prints the contract pages. Northwestern Mutual then compares the printed contract pages to the record at issue to make sure "everything is the same as the original." When asked why the substitute policy sent to Dr. Falcon contained a stamp stating the substitute policy may not be an exact duplicate of the original, Ms. Woyach testified, "that's due to the fact that policy changes could have been done on the policy since it was originally issued, and some of the president or secretaries could have changed since policy was issued. We always provide the current [president or secretary]." (*Id.* ¶¶ 44-45.)

Northwestern Mutual states that the Policy was part of the MM series and that, prior to being sold in Pennsylvania, the MM series had to be submitted to the Insurance Department and approved. The MM series could not be altered once approved. The MM series does not contain a

provision allowing a lifetime benefit for total disability occurring after the policy anniversary that follows the insured's 60th birthday. Northwestern Mutual states that, when it decides to make changes to a policy, it issues a new series, which must be submitted to and approved by the Insurance Department. (*Id.* ¶¶ 46-50.) Dr. Falcon points out that Northwestern Mutual cites no independent evidence in support of these statements and contends that the defense of the Policy being part of a series that had to be approved by the Insurance Department and could not be changed was never raised by Northwestern Mutual prior to the filing of its motion for summary judgment. (PRDSMF ¶¶ 46-50.)[10]

### III. Analysis

#### A. Standard of Review

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or

_____

[10] Dr. Falcon provides the following responses to these statements: "Denied this was Gurlick's declaration." (PRDSMF ¶¶ 47-49). It would appear that he is not denying that these statements were made by Northwestern Mutual actuarial department vice president Gregory Gurlick, whose declaration is part of the record (ECF No. 35 Ex G). Rather, Dr. Falcon appears to be suggesting that Northwestern Mutual relies solely on Mr. Gurlick's declaration, which does not identify the foundation for his statements and cites no external evidence to support them. Accepting the statements as true would depend upon an assessment of Mr. Gurlick's credibility, which the Court cannot do in resolving a motion for summary judgment.

the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of credibility and weighing of evidence are to be decided by the trier of fact, not the court on a motion for summary judgment. *Id.* at 255.

The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

### B.  Breach of Contract Claim (Count I)

In Count I, Dr. Falcon claims that Northwestern Mutual breached its contractual obligation to him by paying him only 24 months of disability benefits rather than the lifetime benefit that he asserts he purchased. Northwestern Mutual contends that pursuant to the provisions of the Policy (as reflected in the Replica Policy), he does not qualify for a lifetime benefit.

"A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citation omitted). The parties do not dispute that the Policy must be interpreted under Pennsylvania law. Under

Pennsylvania law, the insured has the burden of proving facts that bring its claim within the policy's coverage. *Koppers Co., Inc. v. Aetna Cas. & Surety Co.*, 98 F.3d 1440, 1447 (3d Cir. 1996). "By contrast, the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *Id.* (citations omitted).

The Pennsylvania Supreme Court has held that "the interpretation of an insurance contract regarding the existence or non-existence of coverage is 'generally performed by the court.'" *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quoting *Minnesota Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004)). When the language is unambiguous, a court must give effect to its language; if a provision is ambiguous, however, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage." *Id.* (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)).

Northwestern Mutual contends that "giving effect to the clear policy provisions at issue here" (ECF No. 33 at 6), it properly determined that Dr. Falcon is entitled to no more than 24 months of disability payments: the Beginning Date was March 18, 2017 (91 days after he became disabled on December 18, 2016) and the Maximum Benefit Period was 24 months because he did not become disabled prior to the policy anniversary that followed his 60th birthday (February 6, 2012). Dr. Falcon does not dispute, nor could he reasonably do so, that if all of these provisions are part of the Policy he purchased, he would not be eligible for lifetime benefits. Rather, he contends that Northwestern Mutual's Replica Policy does not accurately reflect the Policy he purchased in 1990.

14

Northwestern Mutual has proffered explanations of how it stores information and creates substitute and replica policies. Based upon the provisions of the Replica Policy, it asserts that Dr. Falcon is not entitled to lifetime benefits. However, whether the "existence and contents of a lost writing have been adequately proven is a matter for the finder of fact." *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1422 (D. Del. 1992). The court in that case noted that Rule 1008 of Federal Rules of Evidence explicitly states that "the jury determines … any issue about whether ... (c) other evidence of content accurately reflects the content." F.R.E. 1008(c).

The *Remington Arms* court further noted that:

> A leading treatise on Evidence also stresses that the question of whether or not a party has offered sufficient evidence to prove the contents of a lost writing is a matter for the trier of fact to decide. "[T]he opponent (of the party offering the secondary evidence) may attack the sufficiency of the secondary evidence including the credibility of the witness. This attack, however, goes not to admissibility but to the weight of the evidence and is a matter for the trier of fact to decide."

810 F. Supp. at 1422-23 (quoting Jack B. Weinstein, *Evidence* ¶ 1004[01].)

The court in *Remington Arms* further held that the standard of proof for an insured to demonstrate the terms of a missing insurance policy is by a preponderance of the evidence. *Id.* at 1424-26. As Dr. Falcon notes, a "lost document may be proven by extrinsic evidence including but not limited to testimony." *Winner Logistics, Inc. v. Labor & Logistics, Inc.*, 2011 WL 10524983, at *10 (Pa. Com. Pl. Mar. 25, 2011) (citing Pa. R.E. 1004; *L.C.S. Colliery, Inc. v. Globe Coal Co.*, 84 A.2d 776, 781 (Pa. 1951)). He will testify that the Policy he intended to purchase was for lifetime benefits if he became disabled before the policy renewal period after his 65th birthday. He asserts that at trial, he will establish the material terms of his policy through testimony and documentary evidence.

Northwestern Mutual cites *Time Insurance Co. v. White*, 803 F. Supp. 2d 552 (S.D. Miss.), *aff'd mem.*, 447 F. App'x 561 (5th Cir. 2011), in support of its contention that under the Federal Rules of Evidence, a replica policy reconstructed from the data stored on its computer is equivalent to the original policy issued. In that case, the insureds contended that the policy they purchased did not have a $2,500 cap for outpatient services, despite the fact that the insurer had a signed application and a signed policy from them that acknowledged and accepted this limit. The court stated that "all documents, including the *signed* Acceptance of Offer and Attestation form, were archived in Time's computer system." The court nevertheless allowed the plaintiffs to use parol evidence to prove the existence of the contract and its terms because the writing had been destroyed or lost in Hurricane Katrina. As the court found, however, plaintiffs' secondary evidence, which consisted of six exemplar policies and the affidavit stating that the policy was not consistent with the application the agent sent to the plaintiffs, was insufficient to prove the contents of the missing policy or create a material issue of fact that the policy on which the insurer relied was not the actual policy. *Id.* at 556-58. There was no discussion of the reasonable expectations of the insured, as discussed below. Indeed, the court of appeals held that the plaintiffs were bound by the terms of the policy they signed, irrespective of the application they submitted. 446 F. App'x at 565.

The *Time Insurance* decision is not persuasive under the facts and law applicable to this case. Under Pennsylvania law, the evidence presented in that case would have been sufficient to require the fact finder to determine whether the policy issued to the insureds was inconsistent with the policy they requested. In addition, Pennsylvania law does not require insureds to sign policies and there is no evidence that Dr. Falcon did so. The only document signed by Dr.

16

Falcon is the application, which does not explicitly provide a limit to the lifetime benefit. Thus, *Time Insurance* is distinguishable from this case.

Citing *Serino v. Prudential Insurance Co. of America*, 706 F. Supp. 2d 584, 591 (M.D. Pa. 2009), Northwestern Mutual also contends that Dr. Falcon may not offer parol evidence of an insurance agent's alleged statements about the contents of an integrated contract. It notes that as in *Serino*, the Replica Policy in this case contains an integration clause which states that "no agent has authority to change the policy or to waive any of its provisions." (ECF No. 35 Ex. H, § 7.1.)

In *Serino*, however, because the original insurance policy existed, there was no need to seek other evidence of its contents. In addition, as the plaintiff failed to respond in a timely manner to the insurer's motion for summary judgment, his filings were stricken, the insurer's facts were deemed admitted and the court relied solely on these facts in reaching its decision. *Id.* at 587 n.3, 588 n.6. In that scenario, of course, there could not be any genuine disputed issues of material fact.

Dr. Falcon states that a lifetime benefit was the benefit that he requested and for which he agreed to pay premiums. During the policy renewal each year, he was sent a declaration document that can be construed to indicate that the maximum benefit period was "LIFETIME" and the initial period was "TO AGE 65." As evidence, he relies on the application and Northwestern Mutual's internal records to show that his insurance benefits were "To age 65 W/LTB" (that is, "with lifetime benefits") with an initial period to age 65. Dr. Falcon further represents that not a single document sent to him from 1990 through 2016 stated that his benefits would change after he reached age 60.

Northwestern Mutual challenges Dr. Falcon's interpretation of the cryptic information on

the application and the declaration pages. It contends that the Policy allowed him to submit a

claim for disability until he reached age 65, but the benefits period is a separate matter. Pursuant

to various provisions in the Replica Policy, it argues, once Dr. Falcon reached age 60, he could

obtain only 24 months of benefits, not lifetime benefits. Northwestern Mutual may present these

arguments to the trier of fact, but the Court cannot draw inferences in its favor as the moving

party.[11] Accepting Northwestern Mutual's contention that the Replica Policy contains all of the

terms and limitations of the Policy that Dr. Falcon actually purchased would require the Court to

accept as credible all of the averments made by the insurer's witnesses, a function that belongs to

the trier of fact.  Moreover, while Northwestern Mutual has also provided explanations of the

meaning of the terms in the application and annual declarations pages, these explanations also

rely upon the credibility of Northwestern Mutual employees that cannot be assessed based on

depositions and declarations submitted in connection with a motion for summary judgment.

*Anderson*, 477 U.S. at 255.

The Pennsylvania Supreme Court has noted that "in light of the manifest inequality of

bargaining power between an insurance company and a purchaser of insurance, a court may on

occasion be justified in deviating from the plain language of a contract of insurance." *Tonkovic v.*

*State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 924 (Pa. 1987). The court noted that there is:

> a crucial distinction between cases where one applies for a specific type of
> coverage and the insurer unilaterally limits that coverage, resulting in a policy
> quite different from what the insured requested, and cases where the insured
> received precisely the coverage that he requested but failed to read the policy to
> discover clauses that are the usual incident of the coverage applied for. When the
> insurer elects to issue a policy differing from what the insured requested and paid

---

[11] Moreover, Northwestern Mutual does not contend that the application itself notified Dr. Falcon that the Policy would be reduced to a two-year benefit if he was not disabled prior to reaching age 60 or that anyone advised him about this limitation.

> for, there is clearly a duty to advise the insured of the changes so made. The burden is not on the insured to read the policy to discover such changes, or not read it at his peril.

*Id.* at 925.

In *Tonkovic*, the insured testified that he applied for disability coverage that would have enabled him to make his mortgage payments in the event of an injury. The insurer denied coverage on the basis of an exclusion, information that was not provided to the insured when he applied for the policy. The insured stated that he was never advised of the variance between the coverage for which he applied and the terms of the policy that was issued and further, that he never received a copy of the policy. The jury found for the insured. After the Superior Court reversed, the Pennsylvania Supreme Court reinstated the jury verdict, stating that:

> The reasonable expectation of the insured is the focal point of the insurance transaction involved here. *E.g. Beckham v. Travelers Insurance Co.*, 424 Pa. 107, 117-18, 225 A.2d 532, 537 (1967). Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect that they will receive something of comparable value in return for the premium paid. Courts should also keep alert to the fact that the expectations of the insured are in large measure created by the insurance industry itself. Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of the insured's lack of understanding of the transaction.

*Id.* at 926 (citation omitted).[12] *See also Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366, 368-69, 371 (Pa. 1977) (parol evidence rule does not bar oral testimony to show that the writing is not an accurate expression of the agreement between the parties).

The evidence of record includes Dr. Falcon's representation that he told Northwestern Mutual's agent that he wanted a disability policy which included lifetime benefits.  According to his testimony, he was not told that he could not obtain such a policy or that the Policy that Northwestern Mutual claims was issued would limit benefits to two years if he became disabled after the policy anniversary following his 60th birthday. The original policy no longer exists. The Replica Policy does not provide the coverage sought by Dr. Falcon, but there are issues of fact about how it was created.  Issues of material fact also exist regarding the meaning of certain terms in the application and subsequent documents that Dr. Falcon received and whether he received a copy of the Policy at any time before he became disabled. Therefore, there is sufficient evidence to create genuine issues of material fact regarding Dr. Falcon's reasonable expectations, the nature of the discussions with Northwestern Mutual's agent, the meaning of certain terms in documents issued by Northwestern Mutual, whether Northwestern Mutual offered the type of coverage that Dr. Falcon wanted and whether the Replica Policy accurately represents the policy that was issued.This is evidence that the trier of fact will have to weigh.

Therefore, with respect to Count I, Northwestern Mutual's motion for summary judgment will be denied.

_____

[12] With respect to Dr. Falcon's breach of contract claim, Northwestern Mutual asserts that in *Tonkovic*, the insured applied for coverage that was actually available from the insurer but was issued a policy with different coverage. However, if, in fact, Dr. Falcon requested lifetime benefits and if that coverage was not available under any of its policies, it remains an issue of fact as to why Northwestern Mutual issued a policy to Dr. Falcon at all.

### C. __Tort Claims (Counts II and IV)__

In the alternative, Dr. Falcon also asserts claims of negligence (Count II) and negligent misrepresentation (Count IV). Northwestern Mutual moves for judgment in its favor with respect to both of these claims based on the gist of the action doctrine.

The Pennsylvania Supreme Court has stated that:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (footnotes and citations omitted).[13]

In *Bruno*, the plaintiff homeowners sued their insurer, Erie Insurance Co., after its adjuster and engineer came to their home to investigate mold that the Brunos found in their basement and told them that the mold was harmless, had no health consequences and that they should continue to tear out the paneling in their basement. Plaintiffs followed this advice but suffered health problems from mold exposure and eventually the house became uninhabitable.

---

[13] Northwestern Mutual cites cases that predate *Bruno* and predict that the Pennsylvania Supreme Court would adopt the gist of the action doctrine. However, the United State Supreme Court has held that "the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).

Erie paid the Brunos $5,000 that was owed under the insurance policy for testing and attempted remediation of the mold. The Brunos then brought an action against Erie for negligence regarding the assurances made by Erie.

The Bruno court observed that "the mere existence of a contract between two parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." *Id.* at 69. Finding that plaintiffs were not limited to a breach of contract claim, the Pennsylvania Supreme Court held that:

> Accordingly, while Erie had contractual obligations under its policy to investigate whether mold was present, and also to pay for all property damage caused by mold, the substance of the Brunos' allegations is not that it failed to meet these obligations; rather, it is that Erie, during the course of fulfilling these obligations through the actions of its agents, acted in a negligent manner by making false assurances regarding the toxicity of the mold and affirmatively recommending to the Brunos that they continue their renovation efforts, which caused them to suffer physical harm because of their reasonable reliance on those assurances. Consequently, these allegations of negligence facially concern Erie's alleged breach of a general social duty, not a breach of any duty created by the insurance policy itself.

*Id.* at 71 (footnote omitted).

Northwestern Mutual argues that its only duties to Dr. Falcon, and Dr. Falcon's corresponding entitlement to disability benefits, were created by the Policy, not by the larger social policies embodied in the law of torts. In the absence of any insurance policy, there would be no relationship between the parties and, therefore, no duty to pay benefits.

In turn, Dr. Falcon argues that the fact that the parties entered into a contract does not mean that Northwestern Mutual's only duties to him stemmed from the Policy. *See Dittman v. UPMC*, 196 A.3d 1036, 1056 (Pa. 2018) (UPMC had a common law duty to use reasonable care in storing employee data, despite the existence of employment contracts). *See also Telwell, Inc.*

*v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 430 (Pa. Super. 2016) (gist of the action doctrine did not bar negligent misrepresentation claim). In addition to his claim that Northwestern Mutual breached their agreement to provide a lifetime benefit, he contends that his alternatively pleaded tort claims are not barred by the gist of the action doctrine.

Turning first to the negligence claim in Count I of the Second Amended Complaint, Dr. Falcon does not contend that Northwestern Mutual breached the Policy by not providing him with the benefits to which he is entitled. Rather, he claims that Northwestern Mutual was negligent by not providing him with the policy that he requested.

Similarly, Dr. Falcon alleges in his negligent misrepresentation claim in Count IV that Northwestern Mutual falsely represented that the Policy he purchased provided the lifetime benefit he wanted and did so with the intent of inducing Dr. Falcon to purchase the Policy based on this representation. He alleges that he justifiably relied on Northwestern's false representations to his detriment by purchasing a policy that did not contain the lifetime benefit.

Dr. Falcon also indicates that several Northwestern Mutual employees told him that his Policy provided for lifetime benefits through age 65, and that he relied on these statements when he opted not to increase coverage or find excess coverage with another company. Thus, to the extent it is determined that the Policy did not actually provide lifetime benefits for disability through age 65, he claims to have sustained damages by relying on these statements.

Here, it is undisputed that an insurance policy was issued for which Dr. Falcon paid premiums and received some benefits, albeit not the lifetime benefits he sought. While the parties agree that they entered into an insurance agreement, they dispute its content. As previously discussed, whether Dr. Falcon can prove that the existence of the insurance contract that he claims was issued is a matter for the fact finder.

23

Northwestern Mutual cites the integration clauses in the Policy to preclude Dr. Falcon from testifying about what kind of policy he expected. However, the Pennsylvania Supreme Court has held that "whether an action is in trespass or in assumpsit, the parol evidence rule is no bar to oral testimony designed to show that the writing is not an integrated contract. If a party contends that a writing is not an accurate expression of the agreement between the parties, and that certain provisions were omitted therefrom, the parol evidence rule does not apply." *Rempel*, 370 A.2d at 371 (citations omitted). *See also DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 590 (Pa. Super. 2013) ("There is an exception to the parol evidence rule which allows parol evidence to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake.") (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004).

"In view of the trust placed in insurance agents, it is 'not unreasonable' for consumers 'to rely upon the representations of the expert rather than on the contents of the insurance policy itself, or to pass when the time comes to read the policy.' Ultimately, policyholders have no duty to read the policy and are entitled to rely upon agent's representations unless the circumstances of the case make it 'unreasonable' for them not to read the policy." *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 840-41 (Pa. Super. 2005) (quoting *Toy v. Metropolitan Life Ins. Co.*, 863 A.2d 1, 12-13 (Pa. Super. 2004)).

The negligence claims are asserted in the alternative. In essence, Dr. Falcon alleges that even if the Policy is the operative agreement, Northwestern Mutual negligently misrepresented the benefits he would be entitled to receive and negligently issued a policy that was inconsistent with its representations. According to evidence submitted by Dr. Falcon, the annual documents he then received from Northwestern Mutual also led him to believe that he had a lifetime benefit,

24

as did statements from several Northwestern Mutual employees that the Policy provided for lifetime benefits through age 65, and that he relied on these statements when he opted not to increase coverage or find excess coverage with another company.

Northwestern Mutual has not demonstrated that as a matter of law, Dr. Falcon's claims for negligence and negligent misrepresentation are barred by the gist of the action doctrine, or that his testimony is barred by the parol evidence rule. Therefore, with respect to Counts II and IV, the motion for summary judgment will be denied.

### E. UTPCPL Claim (Count V)

In Count V, Dr. Falcon alleges that Northwestern Mutual's actions violated the UTPCPL. The UTPCPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. C.S. § 201-3. This includes certain categories of conduct listed in § 201-2 as well as "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. C.S. § 201-2(4)(xxi).

Northwestern Mutual contends that Dr. Falcon cannot maintain a claim under the UTPCPL because it is based on the fraud claim which has been dismissed by stipulation. (ECF No. 27 ¶ 67.) In turn, Dr. Falcon asserts that this claim is based on the lower standard of "deceptive conduct," not the higher standard of fraud. *See Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399 (E.D. Pa. 2008) (concluding that the inclusion of the term "deceptive" in the catch-all provision of the UTPCPL relaxes the standard of proof such that actual fraud need not be proved). *See also Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 469 (E.D. Pa. 2009) (because the statute says "fraudulent or deceptive conduct," requiring all conduct to be fraudulent would render the word "deceptive" superfluous and comports with the Pennsylvania Supreme Court's directive to construe the statute liberally).

Northwestern Mutual contends that the refusal to pay a claim is nonfeasance, which is not actionable under the statute. Dr. Falcon responds that his claim relates to misfeasance because it is not based on the refusal to pay but on representations made during the purchase of the Policy.

"In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the [UTPCPL] and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." *Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 307 (3d Cir. 1995) (citing *Gordon v. Pa. Blue Shield*, 548 A.2d 600, 604 (Pa. Super. 1988)). *See also Parasco v. Pacific Indem. Co.*, 870 F. Supp. 644, 648 (E.D. Pa. 1994).

Dr. Falcon contends that his claim is based on his justifiable reliance on representations made by Northwestern Mutual, and that there are disputed material facts which relate to the misrepresentation of the contents and conditions of the Policy, which represents misfeasance.

In order to establish the existence of unlawful "deception," a plaintiff must demonstrate that: (1) the defendant engaged in conduct that was likely to deceive an objectively reasonable individual under the relevant circumstances; (2) he or she justifiably relied on the information (or misinformation) presented by the defendant; and (3) he or she suffered damages as a proximate result of such reliance. *Seldon*, 647 F. Supp. 2d at 470. Whether a plaintiff's reliance was justifiable is "typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 467 (E.D. Pa. 2010) (quoting *Toy*, 928 A.2d at 208).

Dr. Falcon has indicated that representations were made by Northwestern Mutual's agent that he was purchasing a disability policy that provided "lifetime benefits up to age 65," that he

justifiably relied on these representations and that he suffered damages because Northwestern Mutual later took the position that the Policy did not provide this benefit because he did not become disabled until after he reached age 60. He has presented sufficient evidence to support a claim under the UTPCPL that must be weighed by the trier of fact.

Therefore, with respect to Count V, the motion for summary judgment will be denied.

### F.  Bad Faith Claim (Count VI)

In Count VI, Dr. Falcon alleges that Northwestern Mutual engaged in bad faith conduct in violation of 42 Pa. C.S. § 8371. Northwestern Mutual argues that there is no record evidence that it lacked a reasonable basis for the way in which it handled the matter. Dr. Falcon takes the position that the manner in which his claim was handled does, in fact, demonstrate that Northwestern Mutual acted in bad faith.

Pennsylvania's bad faith statute provides that:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S. § 8371. A bad faith claim is distinct from the underlying contractual insurance claims from which the dispute arose.  *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 792 (Pa. Super. 1997), *appeal denied*, 717 A.2d 1028 (Pa. 1998).

As noted by the Pennsylvania Superior Court:

To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the

27

> policy and (2) knew or recklessly disregarded its lack of a reasonable basis in
> denying the claim. *Terletsky v. Prudential Property and Casualty Insurance
> Company*, 437 Pa. Super. 108, 649 A.2d, 680, 688 (1999). Bad faith claims are
> fact specific and depend on the conduct of the insurer vis à vis the insured.
> *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881, 887 (Pa. Super. 2000).

*Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super.), *appeal denied*, 912 A.2d 838

(Pa. 2006). Mere negligence or bad judgment is not bad faith. *Bonenberger v. Nationwide Mut.*

*Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. 2002).

The Pennsylvania Supreme Court has held that "proof of an insurer's motive of self-

interest or ill-will, while potentially probative of the second prong, is not a mandatory

prerequisite to bad faith recovery under Section 8371." *Rancosky v. Washington Nat'l Ins. Co.*,

170 A.3d 364, 377 (Pa. 2017). Thus, to the extent that Northwestern Mutual relies upon

statements in prior cases which suggested that a policyholder has to demonstrate that an

insurance company acted "with a dishonest purpose" or "through some motive of self-interest or

ill-will" in order to recover on a bad faith claim (ECF No. 33 at 15-16), this argument is no

longer viable.

Dr. Falcon points to a number of facts that he claims to support his bad faith claim. First,

he contends that the adjustor sarcastically remarked that it was "convenient" that he applied for

benefits shortly before his policy was set to expire. Second, he points to Northwestern Mutual's

inconsistent response, first sending him a "substitute policy" and then a "replica policy," each of

which had missing pages and differed from the other and from the policy he believed he had

purchased. He contends that Northwestern Mutual's practice of not maintaining original copies

of policies is further evidence of bad faith toward its insureds because this practice shifts the

burden to the insureds to produce the terms of the policies.[14] In addition, Northwestern Mutual never informed him of the relevant limitations of the Policy, even when it offered the opportunity to purchase a new policy when he approached age 65.

Northwestern Mutual argues that because it had a reasonable basis for denying Dr. Falcon's claim for lifetime benefits, it cannot have acted in bad faith. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). As explained above, while this may ultimately be proven, the Court cannot determine on a motion for summary judgment whether Northwestern Mutual had a reasonable basis for its denial. Moreover, as Dr. Falcon observes, Northwestern Mutual's behavior during the claim process constitutes evidence in support of his claim that it acted in bad faith. Therefore, with respect to Count VI, the motion for summary judgment will be denied

### G. <u>Declaratory Judgment (Count VII)</u>

In Count VII, Dr. Falcon requests a declaratory judgment that he is entitled to lifetime benefits under the Policy. For the reasons explained above, the Court concludes that Northwestern Mutual has not demonstrated that it is entitled to summary judgment on Dr. Falcon's claims.  Therefore, its motion regarding the declaratory judgment claim will be denied.

---

[14] Dr. Falcon contends that "this is not the first time that Northwestern Mutual has destroyed a policy and attempted to defraud a customer." (ECF No. 38 at 14.) In his Counterstatement of Material Facts, he cites to three cases in which Northwestern Mutual was found to have engaged in improper practices (ECF No. 39 ¶¶ 86-96) and contends that the insurer engages in "habitual fraud on its clients" and displays "a pattern and practice of unfair trade practices." The Court agrees with Northwestern Mutual that these unrelated cases are irrelevant to the issues in this case.

**IV.** <u>**Conclusion**</u>

For the reasons cited above, Defendant's motion for summary judgment (ECF No. 32) will be denied.

An appropriate order will be entered.

BY THE COURT:

Dated: November 30, 2020

s/Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge